
FILED
Jan 17 2019, 8:34 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Curtis T. Hill, Jr.
Attorney General of Indiana

Aaron T. Craft
Patricia C. McMath
Deputy Attorneys General
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Dennis K. Frick
Emma L. Douglas
Indiana Legal Services, Inc.
South Bend, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Indiana Family and Social
Services Administration,

*Appellant-Defendant,*

v.

Lance Patterson,

*Appellee-Plaintiff.*

January 17, 2019

Court of Appeals Case No.
18A-PL-925

Appeal from the Henry Circuit
Court

The Honorable Kit C. Dean Crane,
Judge

Trial Court Cause No.
33C02-1703-PL-19

**Mathias, Judge.**

[1]     This case requires us to once again delve into what we have previously referred to as the "unfortunately convoluted and complex" and "Byzantine" Medicaid system. *Legacy Healthcare, Inc. v. Barnes & Thornburg*, 837 N.E.2d 619, 622 & n.2 (Ind. Ct. App. 2005), *trans. denied*; *see also Schweiker v. Gray Panthers*, 453 U.S.

34, 43 (1981) (referring to the Social Security Act, of which the Medicaid system is a part, as having a "Byzantine construction" that "makes the Act 'almost unintelligible to the uninitiated.'") (quoting *Friedman v. Berger*, 547 F.2d 724, 727, n. 7 (2d Cir. 1976)).

[2]     At issue here is how to determine the portion of nursing home costs required to be paid by Lance Patterson ("Patterson"), a Medicaid recipient whose limited income is subject to a garnishment order due to a rather substantial child support arrearage. The Indiana Family and Social Services Administration ("the FSSA") determined that the garnished portion of Patterson's income should be included when determining Patterson's portion of the cost of his care. Patterson challenged this decision by filing a claim for judicial review in Henry Circuit Court. The trial court entered judgment in favor of Patterson, determining that the garnished portion of Patterson's income should be excluded when determining Patterson's share of nursing home costs because Patterson did not actually receive this income. The FSSA appeals the trial court's decision, arguing that the trial court erred in granting Patterson's petition because the FSSA's decision was consistent with federal and state law and was neither arbitrary nor capricious. Because we agree with the FSSA, we reverse.

# The Medicaid System

*A. Medicaid Overview*

Before we address the specific facts of this case, we first present a relatively brief explanation of the Medicaid system. Title XIX of the Social Security Act, referred to as "Medicaid," was enacted by the United States Congress in 1965. *Legacy Healthcare*, 837 N.E.2d at 622 (citing *Sullivan v. Day*, 681 N.E.2d 713, 715 (Ind. 1997)). The purpose of Medicaid "is to provide medical assistance to needy persons whose income and resources are insufficient to meet the expenses of health care." *Brown v. Ind. Family & Soc. Servs. Admin.*, 45 N.E.3d 1233, 1236 (Ind. Ct. App. 2015) (citing *Ind. Family & Soc. Servs. Admin. v. Thrush*, 690 N.E.2d 769, 771 (Ind. Ct. App. 1998), *trans. denied*).

"The Medicaid statutes create a comprehensive cooperative federal-state program for medical care under which participating states are federally financed for their medical assistance programs if they submit a state plan which comports with federal requirements." *Legacy Healthcare*, 837 N.E.2d at 622 (citing 81 C.J.S. *Social Security & Public Welfare* § 247 (2004)). Thus, the Medicaid program operates through a combined scheme of state and federal statutory and regulatory authority. *Brown*, 45 N.E.3d at 1236. Although a state's participation in Medicaid is voluntary, once a state chooses to participate, as Indiana has, that state must comply with the federal statutes and regulations governing the program. *Legacy Healthcare*, 837 N.E.2d at 622 (citing 81 C.J.S. at § 247); *see also Schweiker*, 453 U.S. at 43–44 (stating that states

participating in Medicaid must "grant benefits to eligible persons 'taking into account only such income and resources as are, as determined in accordance with standards prescribed by the Secretary [of Health and Human Services], available to the applicant.'") (citing 42 U.S.C. § 1396a(a)(17)(B)).

[5] States that elect to participate in the Medicaid program and receive federal funds must make Medicaid available to all persons who are deemed "categorically needy." *Lazzell v. Ind. Family & Soc. Servs. Admin.*, 775 N.E.2d 1113, 1117 (Ind. Ct. App. 2002) (citing *Sullivan*, 681 N.E.2d at 715); *see also* 42 C.F.R. § 435.4 (defining "categorically needy."). Whether a person is "categorically needy" is determined by reference to eligibility for certain other programs, including supplemental security income ("SSI"). *See id.*; *see also* 42 U.S.C. § 1396a(a)(10)(A)(i)(II)(aa);[1] 42 C.F.R. § 435.120.

[6] States may also opt to provide Medicaid available to the "optional categorically needy."[2] That is, states may, at their option, cover other categorically needy groups of people. *See* 42 U.S.C. § 1396a(a)(10)(A)(ii); 42 C.F.R. § 435.201; *Herweg v. Ray*, 455 U.S. 265, 268–69 (1982). Indiana has chosen to provide Medicaid coverage to certain institutionalized, disabled individuals whose

---

[1] A citation as complex as section "1396a(a)(10)(A)(i)(II)(aa)" calls to mind Judge Friendly's comment that "a draftsman who has gotten himself into a position requiring anything like this should make a fresh start." *Friedman*, 547 F.2d at 727 n.7. We further agree that "[s]uch unintelligibility is doubly unfortunate in the case of a statute dealing with the rights of poor people." *Id.*

[2] States are permitted, but not required to offer Medicaid to those deemed "medically needy," which is defined as "individuals whose income or resources were too great to qualify for categorically needy assistance but were unable to pay for necessary medical expenses." *Lazzell*, 775 N.E.2d at 1117 (citing *Roloff v. Sullivan*, 975 F.2d 333, 335 (7th Cir. 1992)). Indiana has chosen not to provide Medicaid to the medically needy. *Id.*

monthly income is too high to otherwise qualify as categorically needy, so long as the individual's monthly income does not exceed the special income level of 300 percent of the maximum payable SSI benefit. *See* 405 I.A.C. 2-1.1-5(g); *see also* 42 U.S.C. § 1396a(a)(10)(A)(ii)(V); 42 C.F.R. § 435.1005.

*B. Medicaid Eligibility Determination*

[7] States participating in Medicaid must establish reasonable standards for determining eligibility, including the reasonable evaluation of an applicant's income and resources. *Brown*, 45 N.E.3d at 1236. To qualify for Medicaid, an applicant must meet both an income-eligibility test and a resources-eligibility test. *Id*. If either the applicant's income or the value of the applicant's resources is too high, the applicant does not qualify for Medicaid. *Id*.

[8] The federal Department of Health and Human Services ("HHS") has promulgated regulations establishing financial eligibility requirements for Medicaid applicants and recipients. A state may opt to use a less restrictive income methodology, so long as its methods do not result in granting Medicaid benefits to those whose income, as calculated using SSI standards, exceeds the "special income level." *See* 42 U.S.C. § 1382a; 42 U.S.C. § 1396a(r)(2); 42 C.F.R. § 435.601(d)(1)(ii), (d)(2). A state's plan must specify whether it will use the relevant federal standard or a less-restrictive standard. 42 C.F.R. § 435.601(f). Indiana has adopted the federal rule, not a less-restrictive option. Specifically, 405 Indiana Administrative Code section 2-1.1-5(a) states, "Individuals declared eligible for benefits by reason of age, disability, or

blindness are subject to the income definition and exclusions set forth in 42 U.S.C. 1382a and 20 CFR Part 416, Subpart K Income."[3]

[9] A disabled person who has been continuously institutionalized for at least thirty days is eligible for Medicaid under federal standards if his or her monthly income, as determined under 42 U.S.C. § 1382a, does not exceed 300 percent of the maximum SSI benefit. 42 U.S.C. §§ 1396a(a)(10)(A)(ii)(V), 42 C.F.R. §§ 435.236(a), 435.1005. In 2016, the maximum payable SSI benefit for an individual was $733 monthly in 2016. It increased to $735 in 2017, and to $750 in 2018. *See SSI Federal Payment Amounts* https://www.ssa.gov/oact/COLA/SSIamts.html.

[10] An individual's includible income includes gross earnings, net rental income, net self-employment income, and all gross unearned income except SSI benefits. 405 I.A.C. 2-1.1-5(g)(2). In determining Medicaid eligibility, the Act requires the State to "tak[e] into account only such income and resources as are, as determined in accordance with standards prescribed by the Secretary, *available* to the applicant or recipient[.]" 42 U.S.C. § 1396a(a)(17)(B) (emphasis added).

[11] Pursuant to 42 U.S.C. § 1382a(a), "income" includes "both earned income and unearned income[.]" "Earned income" includes wages, and "unearned income"

---

[3] 20 C.F.R. Part 416, Subpart K encompasses 20 C.F.R. §§ 416.1100 through 416.1182.

including disability benefits. *Id.* at § 1382a(a)(1)(A), (a)(2)(B). As explained in the Code of Federal Regulations section entitled "What is earned income":

> Earned income may be in cash or in kind. We may include more of your earned income than you actually receive. **We include more than you actually receive if amounts are withheld from earned income because of a garnishment** or to pay a debt or other legal obligation, or to make any other payments. . . .

20 C.F.R. § 416.1110 (emphasis added).

A similar provision applies to unearned income:

> (b) Amount considered as income. We may include more or less of your unearned income than you actually receive.
>
> * * *
>
> (2) We also include more than you actually receive if amounts are withheld from unearned income because of a garnishment, or to pay a debt or other legal obligation, or to make any other payment such as payment of your Medicare premiums.

20 C.F.R. § 416.1123(b)(2).

In the present case, neither party makes any argument regarding Patterson's Medicaid eligibility; they both agree that Patterson is eligible for Medicaid. The question is, even though Patterson is eligible for Medicaid, how much of his income must he still contribute to the cost of his care, and how is this amount to be determined.

*C. Post-Eligibility Income Determination*

[14] A disabled person who is in an institution and who qualifies for Medicaid must still contribute some of his or her income to the cost of his or her institutional care, and Medicaid pays for the remaining costs at the Medicaid reimbursement rate. Medicaid Program Payments to Institutions, 53 Fed. Reg. 3586, 3586 (Feb. 8, 1988) (explaining 42 C.F.R. § 435.725). A state Medicaid agency must "reduce its payment to an institution . . . by the amount that remains after deducting the amounts specified in paragraphs (c) and (d) of this section, from the individual's total income." 42 C.F.R. § 435.725(a)(1). States have the option of using either the individual's "total income received" or a projected "monthly income for a prospective period not to exceed 6 months." 42 C.F.R. § 435.725(e)(1).

[15] Once the agency identifies the recipient's total income, it must then apply the deductions in paragraphs (c) and may apply the items listed in paragraph (d). 42 C.F.R. § 435.725(c), (d). The five mandatory deductions are: (1) a personal-needs allowance; (2) maintenance needs of spouse; (3) maintenance needs of family; (4) qualified medical expenses not subject to third-party payment; and (5) the full amount of SSI benefits. 42 C.F.R. § 435.725(c).[4] The recipient's total income less these deductions constitutes his Medicaid liability—i.e., what he

---

[4] A state agency may also deduct an amount for maintenance of the recipient's home, so long as there is a reasonable likelihood that the person will return home within six months. 42 C.F.R. § 435.725(d).

must pay for his nursing home care and what Medicaid will not cover. 42 C.F.R. § 435.725(a).

[16] In Indiana, 405 I.A.C. 2-1.1-7(a) addresses the portion of costs that a Medicaid recipient, such as Patterson, must pay toward the costs of his or her care. The FSSA first determines the "recipient's total income that is not excluded by federal statute." 405 I.A.C. 2-1.1-7(a)(2). It then makes five deductions: (1) a statutory-minimum personal-needs allowance; (2) an increased personal-needs allowance; (3) an amount for health insurance premiums; (4) certain medical expenses for necessary or remedial care; and (5) federal, state, and local income taxes. 405 I.A.C. 2-1.1-7(a)(3)–(7). "The resulting amount is the amount by which the Medicaid payment to the facility shall be reduced," and which must be covered by the Medicaid recipient. 405 I.A.C. 2-1.1-7(a). The parties refer to this as the recipient's "liability," i.e., the portion of the costs of care that must be borne by the recipient. It is this amount, and its calculation, that is at issue here.

## Facts and Procedural History

[17] The historical facts underlying this case appear to be relatively undisputed. At the time of the trial court's decision, Patterson was sixty-two years old and a resident of Miller's Merry Manor nursing home ("Miller's") in Middletown, Indiana. Patterson resides in Miller's as a result of his chronic heart failure, diabetes, and various other medical issues.

[18] Patterson's only income comes from a Social Security Disability Insurance ("SSDI") benefit of $1,236 per month. Patterson is unmarried but has a thirty-two-year-old daughter from a prior marriage. Due to his failure to pay child support during his daughter's minority, Patterson accumulated a large child support arrearage of more than $56,000 in Minnesota.[5] As a result of this arrearage, a Minnesota court issued a garnishment order. Pursuant to this garnishment order, the Social Security Administration ("the SSA") withholds $730.80 from each of Patterson's monthly SSDI checks. The SSA also deducts $2.60 from Patterson's benefit check for monthly health plan premiums. Thus, only $502.60 each month is actually deposited in Patterson's bank account.

[19] The FSSA determined that Patterson was eligible for Medicaid in October 2016; Patterson's income level of $1,236 was less than the "special income level" of $2,199, which represented three times the 2016 maximum payable Supplemental Security Income benefit of $733. The FSSA further determined that Patterson's liability for his nursing home care was $1,181. The FSSA determined Patterson's liability by subtracting from Patterson's total income a $52 personal-needs allowance and $2.60 for health care premiums. The FSSA did not take into consideration that only $502.60 each month was actually deposited in Patterson's bank account, as it considered the whole of Patterson's

---

[5] This amount represents the arrearage as of December 2016, when the trial court issued its order. The arrearage had been as high as $94,000 in 2011.

SSDI benefit as income, without deducting the $730.80 garnished from his check to pay toward the child support arrearage.

[20] On November 1, 2016, the FSSA notified Patterson by mail that, as of that date, he would be responsible for paying $1,181 per month to his nursing home. Patterson administratively appealed the FSSA's determination, arguing that the $730.80 garnished for his child support arrearage should not have been included in determining his Medicaid liability. On December 16, 2016, an Administrative Law Judge ("ALJ") held a hearing on the issue. At the time of this hearing, Patterson owed the nursing home $8,890. On January 20, 2017, the ALJ affirmed the FSSA's initial determination. Patterson then appealed to the FSSA, which on March 2, 2017, issued a final agency action affirming the decision of the ALJ.

[21] Patterson then sought judicial review of the FSSA's decision, filing a complaint for judicial review on March 31, 2017.[6] The trial court held a hearing on February 21, 2018, and issued findings of fact and conclusions of law on March 21, 2018, reversing the FSSA's determination. The FSSA now appeals.

## Standard of Review

[22] The FSSA appeals from the trial court's grant of Patterson's complaint for judicial review of an agency decision. Pursuant to the Indiana Administrative

---

[6] Patterson's complaint included counts for declaratory and injunctive relief under 42 U.S.C. section 1983. The parties later agreed to dismiss the section 1983 claims.

Order and Procedures Act ("AOPA"), "[t]he burden of demonstrating the invalidity of agency action is on the party to the judicial review proceeding asserting invalidity." Ind. Code § 4-21.5-5-14(a). A court may set aside an agency action only if it is:

> (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (2) contrary to constitutional right, power, privilege, or immunity;
>
> (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (4) without observance of procedure required by law; or
>
> (5) unsupported by substantial evidence.

*Id.* at § 14(d). Patterson argued, and the trial court agreed, that the FSSA's income determination was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under subsection 14(d)(1).

[23] Both a trial court and an appellate court review the decision of an administrative agency with the same standard of review. *Gray v. Med. Licensing Bd. of Ind.*, 102 N.E.3d 917, 921 (Ind. Ct. App. 2018). When reviewing a challenge to an administrative agency's decision, a court may not re-try "the facts *de novo* nor substitute its own judgment for that of the agency." *Jay Classroom Teachers Association v. Jay School Corp.*, 55 N.E.3d 813, 816 (Ind. 2016). Instead, a court must defer to an agency's findings if they are supported by substantial evidence. *Id.*

In contrast to our deference to an agency's factual findings, it has been held that a court may review an agency's conclusions of law *de novo*. *Id*. But despite this "*de novo*" review, a court is to give "great weight" to the agency's interpretation of the law. *Id*. (citing *West v. Office of Ind. Sec'y of State*, 54 N.E.3d 349, 353 (Ind. 2016)). "In fact, 'if the agency's interpretation is reasonable, we stop our analysis and need not move forward with any other proposed interpretation.'" *Id*. This is true even if the opposing party presents an equally reasonable interpretation. *Id*.

Patterson argues that our usual deference to an agency's interpretation should not apply because the FSSA is interpreting a federal regulation. Patterson also notes that our supreme court has cited with approval the proposition that "'[c]ourts will give no special deference to interpretation by one agency of another agency's rules.'" *LTV Steel Co. v. Griffin*, 730 N.E.2d 1251, 1257 (Ind. 2000) (quoting Charles H. Koch, Jr., *Administrative Law and Practice* § 11.26, at 140 (2d ed. 1997)). But the two agencies at issue in *LTV Steel* were two separate state-level agencies: the State Ethics Commission and the Indiana Board of Safety Review. The *LTV Steel* court held that the Board of Safety Review's interpretation and enforcement of the State Ethics Code was in excess of the Board's jurisdiction. *Id*. at 1258.

In contrast, the Medicaid program is, as discussed above, a cooperative federal-state program. And Indiana is required to comply with the federal statutes and regulations governing the program. *Legacy Healthcare*, 837 N.E.2d at 622. Thus, we will give great weight to the FSSA's interpretation of federal Medicaid

statutes, rules, and regulations. *See Assateague Coastkeeper v. Maryland Dep't of Env't*, 28 A.3d 178, 206 (2011) (holding that when a state agency is charged with the day-to-day responsibility for enforcing and administering a federal regulation, courts should give deference to the agency's interpretation of that regulation if the language of the agency's regulation is unclear and susceptible to different reasonable interpretations and the agency's interpretation of the regulation is reasonable) (citing *In re Cities of Annandale & Maple Lake NPDES/SDS Permit Issuance for the Discharge of Treated Wastewater*, 731 N.W.2d 502, 515 (Minn. 2007). Accordingly, we will defer to the FSSA's factual findings and only determine if its interpretation of the Medicaid statutes and regulations are reasonable.

# Discussion and Decision

[27] As noted above, the parties do not dispute that Patterson is eligible for Medicaid; both agree that he is. Patterson also does not deny that, when determining eligibility for Medicaid, the FSSA is required to include all of his income, including the portion thereof subject to garnishment. Instead, Patterson notes that there are two, discrete income calculations at issue here. The first one is used in determining Medicaid eligibility; the second, post-eligibility determination is used in determining the Medicaid recipient's liability for a portion of his or her care.

[28] In this post-eligibility determination, the FSSA argues that Patterson's income is still calculated to include even that portion of his income that is subject to the

garnishment order. Patterson claims that, even though the garnished portion of his income is included when determining his eligibility for Medicaid, it is to be excluded when determining his liability for his care. Thus, the question before us is how to calculate Patterson's income for the purposes of determining the portion of his health care expenses Patterson is required to pay himself.

[29] The applicable FSSA regulation, entitled "Post-eligibility treatment of income," provides in relevant part as follows:

> This subsection applies to individuals in institutions.
>
> (1) Except as provided in 405 IAC 2-3-17, the following procedure shall be used to determine the amount of income to be paid to an institution for an applicant or recipient who has been determined eligible under section 5(g) of this rule and who is residing in an institution as defined in 405 IAC 2-1-1(e).
>
> (2) Determine the applicant's or recipient's **total income that is not excluded by federal statute**, which includes amounts deducted in the eligibility determination under section 5(g)(3) of this rule.[7]
>
> (3) Subtract the minimum personal needs allowance specified in IC 12-15-7-2.
>
> (4) Subtract an amount for increased personal needs as allowed under Indiana's approved Medicaid state plan. The increased personal needs allowance includes, but is not limited to, court ordered guardianship fees paid to an institutionalized

---

[7] 405 I.A.C. section 2-1.1-5(g)(3) provides that "[a]ny income from another financially responsible relative described under 405 IAC 2-3-4 will not be included when determining whether an individual falls below the special income level." There is no indication that Patterson has "another financially responsible relative."

applicant or recipient's legal guardian, not to exceed thirty-five dollars ($35) per month. Guardianship fees include all services and expenses required to perform the duties of a guardian, as well as any attorney's fees for which the guardian is liable.

(5) Subtract the amount of any health insurance premiums.

(6) Subtract an amount for expenses incurred for necessary or remedial care recognized by state law but not covered under the state plan, subject to any reasonable limits set forth in Indiana's approved Medicaid state plan.

(7) Subtract an amount for federal, state, and local taxes owed and paid by the applicant or recipient. This deduction is limited to one (1) calendar month per year.

The resulting amount is the amount by which the Medicaid payment to the facility shall be reduced.

405 I.A.C. § 2.1.1-7(a). Notably, there is no provision for the subtraction of wages that are subject to garnishment.

[30]  The federal regulation regarding the post-eligibility determination of income is 42 C.F.R. § 435.725. This rule, entitled "Post-eligibility treatment of income of institutionalized individuals in SSI States: Application of patient income to the cost of care," provides in relevant part as follows:

**(a) Basic rules.**

(1) The agency must reduce its payment to an institution, for services provided to an individual specified in paragraph (b) of this section, by the amount that remains after deducting the amounts specified in paragraphs (c) and (d) of this section, **from the individual's total income**,

(2) **The individual's income must be determined in accordance with paragraph (e) of this section.**

(3) Medical expenses must be determined in accordance with paragraph (f) of this section.

(b) Applicability. This section applies to the following individuals in medical institutions and intermediate care facilities.

(1) Individuals receiving cash assistance under SSI or AFDC who are eligible for Medicaid under § 435.110 or § 435.120.

(2) Individuals who would be eligible for AFDC, SSI, or an optional State supplement except for their institutional status and who are eligible for Medicaid under § 435.211.

(3) Aged, blind, and disabled individuals who are eligible for Medicaid, under § 435.231, under a higher income standard than the standard used in determining eligibility for SSI or optional State supplements.

(c) Required deductions. In reducing its payment to the institution, the agency must deduct the following amounts, in the following order, from the individual's total income, as determined under paragraph (e) of this section. **Income that was disregarded in determining eligibility must be considered in this process.**

(1) Personal needs allowance. A personal needs allowance that is reasonable in amount for clothing and other personal needs of the individual while in the institution. This protected personal needs allowance must be at least—

(i) $30 a month for an aged, blind, or disabled individual, including a child applying for Medicaid on the basis of blindness or disability;

\* \* \*

(iii) For other individuals, a reasonable amount set by the agency, based on a reasonable difference in their personal needs from those of the aged, blind, and disabled.

(2) Maintenance needs of spouse. . . .

\* \* \*

(3) Maintenance needs of family. . . .

\* \* \*

(4) Expenses not subject to third party payment. Amounts for incurred expenses for medical or remedial care that are not subject to payment by a third party, including—

(i) Medicare and other health insurance premiums, deductibles, or coinsurance charges; and

(ii) Necessary medical or remedial care recognized under State law but not covered under the State's Medicaid plan, subject to reasonable limits the agency may establish on amounts of these expenses.

(5) Continued SSI and SSP benefits. The full amount of SSI and SSP benefits that the individual continues to receive under sections 1611(e)(1)(E) and (G) of the Act.

(d) Optional deduction: Allowance for home maintenance. . . .

\* \* \*

**(e) Determination of income—**

(1) Option. In determining the amount of an individual's income to be used to reduce the agency's payment to the institution, **the agency may use total income received**, or it may project monthly income for a prospective period not to exceed 6 months.

(2) Basis for projection. The agency must base the projection on income received in the preceding period, not to exceed 6 months, and on income expected to be received.

(3) Adjustments. At the end of the prospective period specified in paragraph (e)(1) of this section, or when any significant change occurs, the agency must reconcile estimates with income received.

(f) Determination of medical expenses—

(1) Option. In determining the amount of medical expenses to be deducted from an individual's income, the agency may deduct incurred medical expenses, or it may project medical expenses for a prospective period not to exceed 6 months.

(2) Basis for projection. The agency must base the estimate on medical expenses incurred in the preceding period, not to exceed 6 months, and on medical expenses expected to be incurred.

(3) Adjustments. At the end of the prospective period specified in paragraph (f)(1) of this section, or when any significant change occurs, the agency must reconcile estimates with incurred medical expenses.

42 C.F.R. § 435.725 (emphases added).

[31] The FSSA contends that the amount of the costs of medical care that Patterson is required to pay—his liability—is determined as set forth in subsection (a) of 42 C.F.R. section 435.725. That is, the FSSA must reduce its payment to the nursing home "by the amount that remains after deducting the amounts specified in paragraphs (c) and (d) of [section 435.725] from [Patterson]'s **total income**." *Id.* at § 435.725(a) (emphasis added). The FSSA argues that

Patterson's total income includes the amount subject to the Minnesota court's garnishment order. Otherwise, the FSSA argues, Medicaid would effectively be subsidizing Patterson's child support delinquency.

[32] Patterson argues that that portion of his income that is subject to garnishment should not be counted toward his income because subsection (e) refers to "total income **received**." *Id.* at § 435.725(e). Patterson argues that he does not "receive" that portion of his income that is subject to the garnishment order, and that this amount should therefore not be included when determining his income for purpose of calculating his liability for his medical care.

[33] We agree that the references to "total income" in subsection 435.725(a) and "total income received" in subsection 435.725(e) render this section ambiguous. That is, they are subject to two different, reasonable interpretations: one includes all income, the other only income that is "received." But this is all the more reason for us to defer to the FSSA's interpretation of this rule.

[34] More importantly, the HHS has indicated that it interprets the income calculation set forth in 42 C.F.R. section 435.725 to include the same income calculation that is used in determining Medicaid eligibility, which calculation includes income that is subject to garnishment. When issuing an amendment to 42 C.F.R. section 435, the HHS Secretary commented that, regarding the issue of interest and dividends, "[t]he post-eligibility process is based on a consideration of all income considered in the eligibility process." Medicaid Program Payments to Institutions, 53 Fed. Reg. 3586, 3587 (Feb. 8, 1988).

[35]     Thus, the HHS has determined that the post-eligibility income calculation for determining a recipient's liability includes "all income" considered in the initial eligibility determination.[8] And it is abundantly clear that the initial eligibility income calculation includes income subject to garnishment. *See* 20 C.F.R. § 416.1110; Supplemental Security Income for the Aged, Blind, and Disabled; How We Count Earned and Unearned Income; Funds Used to Pay Indebtedness, 56 Fed. Reg. 3209 (Jan. 29, 1991) ("These final rules clarify the regulations to reflect a longstanding Social Security Administration (SSA) policy that amounts withheld from earned and unearned income for payment of a debt or other legal obligation are included in income for the purpose of determining eligibility and payment amount under the Supplemental Security Income (SSI) program."). This is directly contrary to Patterson's position that income should be calculated differently depending upon whether the agency is determining eligibility or post-eligibility recipient liability.

[36]     Moreover, the FSSA's interpretation is not unreasonable because it acknowledges that Patterson still receives the benefit of the money that is garnished. By having the garnishment applied to his outstanding child support arrearage, Patterson has received a benefit from the garnishment—his debt is reduced. In fact, if we were to agree with Patterson, the result would be that

---

[8] In fact, 42 C.F.R. section 435.725(c) provides that, in the post-eligibility income determination, "[i]ncome that was disregarded in determining eligibility must be considered in this [post-eligibility] process." Accordingly, the post-eligibility determination is, if anything, more inclusive of income than the eligibility determination.

Medicaid would be effectively subsidizing his child support arrearage. This can hardly have been the intent of the Medicaid program. *See Peura ex rel. Herman v. Mala*, 977 F.2d 484, 490 (9th Cir. 1992) (noting that excluding the full amount of a child support obligation from the "available" income of a Medicaid recipient would lead to unintended subsidization of a disproportionate amount of health care benefits); *Cervantez v. Sullivan*, 963 F.2d 229, 235 (9th Cir. 1992) (noting that excluding garnishment from calculation of income would give claimants an incentive to fail to pay their debts and await garnishment, thereby shifting the cost of repayment to the SSI program), *as amended on denial of reh'g*; *see also* 56 Fed. Reg. 3209, 3211 ("It is not the purpose of the SSI program to subsidize any types of indebtedness whether that indebtedness results from a debtor/creditor relationship or from an obligation imposed by public policy.").

[37] In short, the FSSA's interpretation of the applicable statutes and regulations is reasonable. Because the FSSA's interpretation of the regulations is reasonable, "we must stop our analysis and need not move forward with any other proposed interpretation." *Jay Classroom Teachers Ass'n,* 55 N.E.3d at 816 (citing *West*, 54 N.E.3d at 353). Accordingly, the trial court erred in determining that the FSSA's interpretation was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

[38] We find support for our conclusion in *Ussery v. Kansas Department of Social & Rehabilitation Services.*, 899 P.2d 461 (Kan. 1995). In that case, as here, there was no question that Ussery was entitled to Medicaid benefits. Rather, the issue was the extent of his "patient liability," i.e., "the amount that the individual is

required to pay towards the cost of care which the individual receives in an institutional arrangement." *Id*. at 464. Ussery argued that his court-ordered support for his ex-wife should be excluded from his income when determining his liability. Because neither federal nor state regulations contained an exemption for such support payments, the court rejected Ussery's contention and held that the Kansas Medicaid agency's calculation, which included his support payment, was part of Ussery's available income. *Id*. at 466–67.

[39] A similar conclusion was reached in *Tarin v. Commissioner of the Division of Medical Assistance*, 678 N.E.2d 146 (Mass. 1997). The state Medicaid agency determined that Tarin's court-ordered child support payments should be included in his available income when determining his patient liability. On appeal, the court affirmed the agency's determination, noting that the regulations concerning income exemptions for Medicaid recipients do not provide for any exemption for child support payments when the recipient is not living with a spouse. 678 N.E.2d at 151. The court concluded that the HHS Secretary "has made it clear that income 'available' to a divorced Medicaid recipient may include income used to make court-ordered child support payments." *Id*. The court also noted that:

> Three United States Circuit Courts of Appeals that have considered the matter all have upheld the disallowance of deductions for court-ordered child support payments for a Medicaid income availability determination. *See Himes v. Shalala*, [999 F.2d 684, 690–691 (2d Cir.1993)] (inclusion of child support payments in "available" income is "reasonable attempt to interpret and apply all sections of the statute"; Secretary's

interpretation "is not at odds with the plain meaning of the statute, is reasonable, and should therefore be accorded the usual deference"); *Peura v. Mala*, 977 F.2d 484, 491 (9th Cir. 1992) ("high degree of deference" is owed to Secretary's determination); *Emerson v. Steffen*, [959 F.2d 119, 123 (8th Cir. 1992)] ("[a]lthough not directly defining the term 'available,' the regulations make it plain that . . . states do not have to exclude [child support] payments from income when determining Medicaid eligibility . . . .").

*Tarin*, 678 N.E.2d at 152.[9]

[40] Patterson relies heavily on *Mulder v. South Dakota Department of Social Services.*, 675 N.W.2d 212 (S.D. 2004). In *Mulder*, the South Dakota Medicaid agency determined that Mulder was eligible for Medicaid, but when determining his liability for his care, the agency did not exclude from his monthly income $180 that was withdrawn to pay his alimony obligation. Mulder appealed, and a three-justice majority of the South Dakota Supreme Court agreed with him that

---

[9] Patterson argues that the cases cited by the *Tarin* court, and by the FSSA in the present case, dealt with determining income for the purposes of Medicaid eligibility only, not for post-eligibility patient liability purposes. The *Tarin* court rejected a similar argument, stating:

> We recognize that in both *Himes* and *Emerson* the courts were reviewing the Secretary's determination of a recipient's "available" income for the purpose of establishing only eligibility for Medicaid, and not benefit levels, the issue in this case. However, in *Peura*, the plaintiff, like Tarin, challenged a State's determination of required payments for nursing home costs. In upholding the Secretary's determination, the United States Court of Appeals for the Ninth Circuit concluded that it was "of little import" that the Secretary's determination regarding Peura's child support obligations came "in the context of a post-eligibility determination." *Peura*, *supra* at 487 n.4. *See Ussery v. Kansas Dep't of Social & Rehabilitation Servs.*, 258 Kan. 187, 899 P.2d 461 (1995), upholding the inclusion of court-ordered spousal support payments in a Medicaid recipient's "available" income in establishing benefit levels.

678 N.E.2d at 153. As discussed above, we agree with the *Tarin* court's reasoning on this matter.

the alimony should not be included in his income. *See id.* at 217 ("[T]he Department's determination that Mulder's alimony payments constitute "available income" was not reasonable). We simply disagree with the *Mulder* court and decline to follow it.

[41] Patterson makes a sound policy argument that the FSSA's decision leaves him in the lurch. That is, even though he qualifies for Medicaid, the FSSA's inclusion of the garnished portion of his income in determining his liability means that he is stuck owing the nursing home more money than he has access to. This means that either the nursing home must continue to care for him at a loss, or he must come up with another source of income, which is unlikely. Hopefully, Patterson can find care at a less expensive facility, or at least one that is willing to accept that portion of his care that Medicaid is willing to pay for.

[42] Despite the merits of Patterson's argument, it is not the role of this court to determine Medicaid policy. That role belongs to the FSSA and the HHS. The only question before us is whether the FSSA's interpretation of the relevant state and federal regulations is reasonable, and we cannot say that the FSSA's interpretation is unreasonable.

## Conclusion

[43] Because the FSSA is responsible for implementing the cooperative state-federal Medicaid system in Indiana, we give its interpretation of these statutes and regulations great weight. And since the FSSA's interpretation is reasonable, our

analysis stops there. The trial court's analysis should have stopped there too. We therefore reverse the judgment of the trial court.

[44]    Reversed.


Bailey, J., concurs with opinion.

Bradford, J., concurs.

| | |
|---|---|
| Indiana Family and Social Services Administration, *Appellant-Defendant,* | Court of Appeals Case No. 18A-PL-925 |
| v. | |
| Lance Patterson, *Appellee-Plaintiff.* | |

**Bailey, Judge, concurring.**

[45] I agree that the trial court erred, although I do so reluctantly. "Medicaid is a cooperative State and Federal program designed to provide health care *to needy individuals.*" *Mulder v. South Dakota Dept. of Social Serv.*, 675 N.W.2d 212, 214 (S.D. 2004) (emphasis added). Patterson is, without dispute, a needy individual based upon his limited resources and his institutionalized status. Yet, the FSSA position would leave him evicted from his care facility or necessitate that the facility continuously and substantially subsidize Patterson – something not uniformly required of other providers participating in the Medicaid program. At the end of the process (whereby eligibility is determined in step one and financial liability is calculated in step two), payment allocation is to be made

between government funding and what the impoverished individual can afford to pay. There is no onus upon a provider to subsidize the patient beyond the provision of services at an already-discounted rate.

[46] Unearned income, such as Patterson's disability payments, may include garnished sums. 20 C.F.R. § 416.1123(b)(2). Patterson meets eligibility requirements even with garnished sums, and step two, the financial liability calculation, incorporates the garnished sums as part of Patterson's income. As for Patterson's ability to pay, however, he simply does not have access to funds to satisfy the liability assigned to him. Given the humanitarian purposes of Medicaid, I would expect that "received" should be understood with reference to what one has with which to pay and not a factual or legal fiction. Nevertheless, the establishment of public policy is a legislative function. There are certainly competing policies here: we require parents to support their children, we do not insist that private enterprise subsidize an individual's non-payment, and we do not abandon desperately ill and destitute individuals without care.

[47] True, Patterson did not pay his child support in full. He should have done so if able, given his chronic health conditions. Yet Medicaid is not restricted to those who have acted only legally and wisely. It is plain to me that unwise choices may lead to or contribute to impoverishment (for example, substance abuse, incarceration, or leaving employment). But ultimately, Medicaid applicants are not categorically excluded for past lifestyle choices. Nor are they uniformly penalized for having dependents. Indeed, familial obligations are

taken into account in similar contexts. 42 U.S.C. § 435.725 permits a spousal allowance and a family allowance for certain dependent family members living in the home.

[48] I do not condone a voluntary decision not to pay child support. Yet I find it ironic that, were Patterson imprisoned for felony non-support, he would be provided with the care he desperately needs. In the convergence of circumstances present here – total disability requiring institutionalization, impoverishment, and a state-enforced action for child support arrearage – there is no optimal outcome with equity for all concerned. I understand the trial court's attempt to exercise compassion. However, because the trial court found invalidity of agency action where there was none, I concur in the reversal.